# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Rockingham Superior Court
Rockingham Cty Courthouse/PO Box 1258
Kingston NH  03848-1258

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## SUMMONS IN A CIVIL ACTION

Case Name:     **Katherine H. Stratos v Catholic Medical Center**
Case Number:   **218-2022-CV-00468**

Date Complaint Filed: June 07, 2022
A Complaint has been filed against Catholic Medical Center in this Court. A copy of the Complaint is attached.

**The Court ORDERS that ON OR BEFORE:**

July 29, 2022          Katherine H. Stratos shall have this Summons and the attached Complaint served upon Catholic Medical Center by in hand or by leaving a copy at his/her abode, or by such other service as is allowed by law.

August 19, 2022        Katherine H. Stratos shall electronically file the return(s) of service with this Court. Failure to do so may result in this action being dismissed without further notice.

30 days after Defendant is served          Catholic Medical Center must electronically file an Appearance and Answer or other responsive pleading form with this Court.  A copy of the Appearance and Answer or other responsive pleading must be sent electronically to the party/parties listed below.

**Notice to Catholic Medical Center:** If you do not comply with these requirements you will be considered in default and the Court may issue orders that affect you without your input.

Send copies to:

Lauren Simon Irwin, ESQ          Upton & Hatfield LLP 10 Centre St PO Box 1090 Concord NH 03302-1090

Brooke Lois Lovett Shilo, ESQ          Upton & Hatfield LLP 10 Centre St PO Box 1090 Concord NH 03302

Heather M. Burns, ESQ          Upton & Hatfield LLP 10 Centre St PO Box 1090 Concord NH 03302

Catholic Medical Center          100 McGregor Street Manchester NH  03102

BY ORDER OF THE COURT

June 14, 2022          Jennifer M. Haggar
Clerk of Court

(126954)

NHJB-2678-Se (07/01/2018)

Filed
File Date: 6/7/2022 2:51 PM
Rockingham Superior Court
E-Filed Document

STATE OF NEW HAMPSHIRE

ROCKINGHAM                                         SUPERIOR COURT

Katherine H. Stratos, Plaintiff

v.

Catholic Medical Center, Defendant

Case No. ___218-2022-CV-00468___

### **COMPLAINT**

### **JURY TRIAL DEMANDED**

### **Parties**

1.     The Plaintiff, Katherine H. Stratos, resides at 60 Granite Lane, Chester, New Hampshire 03036.

2.     Defendant Catholic Medical Center (hereinafter "CMC" or "Defendant"), is a domestic nonprofit corporation with a principal place of business of 100 McGregor Street, Manchester, New Hampshire 03102.

### **Jurisdiction and Venue**

3.     At all times relevant hereto, CMC has engaged in an industry affecting commerce and has had more than 50 employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

4.     Venue is proper, as CMC is a domestic nonprofit corporation registered to do business in New Hampshire, and the unlawful acts complained of were committed within the State of New Hampshire.

5.      On or about September 27, 2022, Ms. Stratos filed a Charge of Discrimination and Retaliation (hereinafter "Charge") with the New Hampshire Human Rights Commission and the Equal Opportunity Commission.

6.      Ms. Stratos' Charge was filed with the New Hampshire Human Rights Commission and the Equal Employment Opportunity Commission within 180 days after the unlawful employment acts were committed.

7.      On May 13, 2022, the Equal Employment Opportunity Commission issued Plaintiff a Notice of Right to Sue with respect to her charges of discrimination, thus satisfying the procedural prerequisites established by 42 U.S.C. 2000(e) - 5(b) and (3).  *See* Exhibit A, Notice of Right to Sue, attached hereto and incorporated herein by reference.

8.      This Complaint is filed fewer than 90 days after receipt of the Notice of Right to Sue, dated May 13, 2022 (as attached).

### Facts

9.      Ms. Stratos began working as a Registered Nurse at Catholic Medical Center ("CMC") on or about June 8, 1998.

10.      During her employment at CMC, Ms. Stratos worked exclusively in the ICU.

11.      Throughout her employment with CMC, Ms. Stratos performed her job with knowledge, experience, and competency.

12.      In addition, throughout her employment with CMC, Ms. Stratos received favorable performance reviews.

13.      On or about May 2012, Ms. Stratos suffered an injury which led to permanent, bilateral hearing loss.

14.      Ms. Stratos's hearing loss is a permanent disability.

2

15.     On or about May 2012, Ms. Stratos began wearing bilateral hearing aids.

16.     Ms. Stratos began being subjected to a hostile work environment after May of 2012, when Ms. Stratos was diagnosed with a permanent, bilateral hearing loss.  The hostile work environment continued through her last day of employment with CMC (June 17, 2021).

17.     From May 2012 forward, there was a slow, persistent progression of coworkers rolling their eyes at Ms. Stratos when she would ask them to repeat something.  This continued to the end of her employment with CMC.

18.      In addition, coworkers would make derogatory gestures behind Ms. Stratos' back.  This continued to the end of her employment with CMC.

19.     Coworkers would roll their eyes at one another, sigh, laugh, or throw their arms up in disgust after interacting with Ms. Stratos.  This continued to the end of her employment with CMC.

20.     Coworkers with whom Ms. Stratos had a good rapport told her that other coworkers referred to her as "oh, the deaf nurse" or "she is really smart, but you may have to talk loud at her to get her attention," or "OMG," because they called to her from 30 to 40 feet away and she had to walk towards them and ask them to repeat what they had said.

21.     There were only two occasions on which the ICU Director, Peggy Lambert, ever directly mentioned anything to Ms. Stratos in regard to her hearing.

22.     Once, in approximately 2016, a patient's family member, who was difficult due to the stressful situation with her sick father, complained to management that Ms. Stratos did not fulfill all her requests.  Ms. Lambert asked Ms. Stratos to come to her office for a meeting.  The Day Clinical Leader, Carol Pfaff, was present as well.  Ms. Lambert told Ms. Stratos that a family member was upset and explained what had transpired.  Ms. Stratos told her what she had

3

done so far to help them.  Ms. Lambert then said, "Yes, but did you hear what she asked for?" Ms. Stratos told Ms. Lambert the three things she heard the family member request.  Ms. Lambert agreed that was accurate.  She then stated she was going to reassign that patient to another nurse, not for punishment, but to diffuse the situation for all involved.

23.     A later, second, incident occurred in or about the spring of 2017, when Ms. Stratos had suffered a bad ear infection and was out of work for a couple of days as a result. When Ms. Stratos returned to work, Ms. Lambert asked her how she was doing.  Ms. Lambert then proceeded to tell Ms. Stratos about her own experience with hearing loss and needing surgery to replace the bones in her ears, and how scary it was.  Ms. Lambert stated her surgery was successful and restored her hearing back to normal.

24.     After Ms. Stratos' 2012 hearing loss, CMC demoted Ms. Stratos, despite her high seniority status, her good performance, and her repeated requests for promotion and expressed desire to evolve as a nurse within the department in which she had worked for over 20 years.

25.     By way of example, the Senior Preceptor Role was taken away from Ms. Stratos.

26.     Ms. Stratos served as a Preceptor in CMC's ICU beginning in approximately 2005.

27.     In or about 2017 or 2018, Ms. Lambert, ICU Director, and Jennifer Torosian, VP Nursing, created a Senior Preceptor Role for Ms. Stratos.

28.     The role was created in recognition of Ms. Stratos' seniority status and years of commitment to precepting.

29.     Ms. Lambert wrote the original draft of the job description for this Senior Preceptor Role.

30.     Ms. Lambert then asked the Educator, Tracey Fahie, and Ms. Stratos to review the job description and to offer any additions or edits.

31.     Ms. Stratos reviewed the job description and approached Ms. Lambert in her office with her input.  They discussed potential revisions to the job description at two different times.

32.     Ms. Stratos also told Ms. Fahie, on Friday, January 26, 2018, that she had reviewed the Senior Preceptor Role job description.  Ms. Stratos mentioned to Ms. Fahie that she had proposed edits to Ms. Lambert twice and, both times, Ms. Lambert rejected her changes. Ms. Stratos further told Ms. Fahie that it was clear Ms. Lambert had a particular job description in mind and that they should not attempt to change Ms. Lambert's draft of the Senior Preceptor job description.

33.     Ms. Lambert then asked Ms. Stratos to go over the job description a couple more times.   Ms. Stratos replied that she had nothing more to add and asked Ms. Lambert to submit the job description as it was.  Ms. Stratos thought it was unlikely Ms. Lambert would be open to editing the job description according to any suggestions Ms. Stratos might propose.

34.     Ms. Fahie mentioned to Ms. Stratos that she spoke to Ms. Lambert about submitting the job description and that she added a few things and planned to submit it back to Ms. Lambert on Saturday, January 27, 2018.

35.     Ms. Lambert retired from CMC in or about January 2018.  Following Ms. Lambert's departure, Jennifer Torosian replaced her as Interim ICU Director.

36.     On January 29, 2018, at about 4:30 PM, Ms. Stratos met with Ms. Torosian.  Ms. Torosian stated she had the final job description for the Senior Preceptor Role that had been written for Ms. Stratos.  She told Ms. Stratos it looked good and that she would send Ms. Stratos

the final copy.  She told Ms. Stratos to let her know if there was anything to edit or add.  If this was indeed the final copy, Ms. Torosian stated she would be sending that up to the new VP of Nursing, Jennifer Caisson, for final approval.  She went into her email while she was explaining that to Ms. Stratos, found the job description sent to her by Ms. Lambert, and sent it to Ms. Stratos' work email.

37.     When Ms. Stratos read the email from Jennifer Torosian with the job description later that evening (which was sent Monday, January 29, 2018, 4:37 PM), she realized that a personal email from Ms. Lambert to Jennifer Torosian was also sent along with the job description accidentally.

38.     Ms. Lambert's email to Ms. Torosian was very negative towards Ms. Stratos and showed that Ms. Lambert and the staff were well-aware of Ms. Stratos' hearing issue.  Ms. Lambert made derogatory comments, judgements, and decisions about Ms. Stratos because of her hearing loss.

39.     Ms. Stratos was extremely upset when she saw Ms. Lambert's email to Ms. Torosian.

40.     Weeks later, Ms. Stratos finally got up the nerve to send an email (sent Wednesday, February 28, 2018, 11:54 AM) to Ms. Torosian explaining that Ms. Torosian had accidentally sent her Ms. Lambert's personal email when she sent her the Senior Preceptor Role job description.

41.     Ms. Torosian apologized, looked at the email she had sent to Ms. Stratos, quickly perused it, and said she had not paid much attention to Ms. Lambert's email when she looked at it the first time.

42.     Ms. Torosian also told Ms. Stratos that Ms. Lambert had left under stressful terms, and she felt the email was vengeful.

43.     Ms. Torosian also stated she had checked with clinical leaders about Ms. Stratos and others while preparing for all these new positions and said that she had been told that Ms. Stratos was a senior, very competent, smart, nurse and had been precepting and chairing the Preceptor Committee for quite some time, and that her transition to this new role should be an easy one.

44.     Later, CMC and the Head of Nursing decided they would not be offering Ms. Stratos this position of the Senior Preceptor Role.

45.     In or about March 26, 2018, Kayla Fitzgerald, replaced Ms. Lambert as ICU Director.

46.     In early May of 2018, Ms. Fitzgerald told Ms. Stratos that the position of Senior Preceptor Role would not be posted.  She cited budget restructuring by the new VP of Nursing, Jennifer Caisson.  Ms. Caisson had put the position on hold.

47.     Ms. Stratos told Ms. Fitzgerald that she was disappointed, particularly because Ms. Stratos could have applied for the Resource position if she had understood that in the end, she would not be awarded the Senior Preceptor Role.  Ms. Lambert had created the position for Ms. Stratos as part of management's five-point plan for restructuring of the ICU, and it was agreed upon by the staff in the fall of 2017.

48.     Ms. Stratos asked Ms. Fitzgerald if she had any other positions available in the ICU to offer her that time.  Ms. Fitzgerald stated there were no positions available for Ms. Stratos at that time and that the new VP of Nursing, Ms. Caisson, would likely be restructuring and Ms. Stratos would have to wait to see how things turned out.

49.     As of January 2019, CMC management had never directly spoken to Ms. Stratos about her hearing impairment (excluding the two incidents mentioned above).  Regardless, CMC management was aware she had some degree of a hearing impairment.

50.     Because of the conduct and hostile environment to which Ms. Stratos was subjected, she was humiliated, shamed, and too scared to approach management about the treatment to which she was being subjected based on her hearing loss, until January 2019.

51.     In January 2019, Ms. Stratos sent a letter to Diane Kobrenski, Clinical Leader, ICU Director, Ms. Fitzgerald, and Jane Delmar in Human Resources, explaining her hearing impairment, its history, its status at that time, and examples of deliberate speaking techniques she needed to ensure effective communication between herself and any coworker.  Ms. Stratos titled the letter "challenged letter" in the subject line of the email.

52.     In response to the letter, Ms. Delmar explained New Hampshire laws, CMC protocols, and Ms. Stratos' rights under the ADA.  Ms. Delmar said it was her job to ask about and offer to Ms. Stratos reasonable accommodations to allow her to continue to work in the position outlined in her job description.

53.     By mutual agreement, management sent Ms. Stratos' letter to all of her coworkers by interoffice email.

54.     Thus, by January 2019, all of Ms. Stratos' managers and coworkers fully recognized that she suffers from permanent hearing loss.

55.     At that time, the accommodation Ms. Stratos requested was to have the charge phone set up by Information Systems for bluetooth streaming, which was done, along with installing the Voalte app. on her personal phone, to facilitate communication when she was not in charge.

56.     At that time, Ms. Stratos also requested that CMC ensure that her coworkers facilitate her ability to hear them by engaging in "deliberate speech."  The term "deliberate speech" as Ms. Stratos described to her coworkers, included having coworker communicating with her be aware of things such as facing towards her, being within a few feet of her vicinity, making sure they had her attention, etc.  Ms. Stratos asked her coworkers to directly to engage in "deliberate speech" so Ms. Stratos could hear them and they could all be communicating effectively.

57.     Much of the time, Ms. Stratos' coworkers did not engage in "deliberate speech." When they failed to do that, Ms. Stratos would sometimes not hear what they said, and then they would roll their eyes at her because she did not hear them properly and because she asked them to repeat themselves, or because she tried to re-state what they said to be sure she had heard them correctly.

58.     Ms. Stratos believes that she has suffered discrimination and retaliation since clearly notifying management and coworkers of her permanent hearing loss.

59.     However, even before Ms. Stratos sent the "challenged letter," management and coworkers at CMC realized Ms. Stratos had a hearing loss issue, but never directly asked or talked to her about it.

60.     Both before and after the "challenged letter," there was an undercurrent of employees and management talking behind Ms. Stratos' back about the hearing impairment they all knew she had, but would not approach her about face to face.  This created a bias against Ms. Stratos that affected their judgement and decisions about her.

61.     Two written warnings were placed in Ms. Stratos' permanent personnel file maintained by CMC.  Each of these written warnings is inaccurate.

9

62.     CMC did not properly investigate the alleged incidents that led to each of the written warnings.  These incidents were "investigated and assessed" with a negative bias against Ms. Stratos because of her hearing loss.  The investigations of the issues that led to the warnings did not have a complete set of information from both sides.

63.     The warnings were examples of discrimination that Ms. Stratos was exposed to for a number of years after her hearing loss.

64.     The first written warning in May-June 2018, was for "not following orders."  The facts that formed the basis of this warning occurred while Ms. Stratos was teaching open heart protocols with an orientee on a fresh heart patient.

65.     The second incident took place in November 2019 (after the "challenged letter" was released in January 2019) and involved an issue of working extra hours as Charge Nurse to cover an unsafe staffing situation in the ICU.

66.     Ms. Stratos suffered yet another career setback in the ICU in the spring of 2019. She was offered the position of Permanent Charge Role, a position which provided continuity, leadership, and staff development in the ICU.  Another senior RN, Trish Hogan, and Ms. Stratos split the day position of this Permanent Charge Role.

67.     A couple of months later, Ms. Stratos was not assigned the Permanent Charge Role one day, and her other coworkers told her that ICU management had removed the Permanent Charge Role.  When Ms. Stratos asked management what happened, they said they got busy and forgot to let her know that the Permanent Charge Role had been removed.  Ms. Stratos was told that the Permanent Charge Role was not feasible at the time.  Ms. Stratos asked if the removal of this role was "universal," meaning that both Trish Hogan and she would lose the position of Permanent Charge Role, and was told, "yes," it was indeed universal.

68.     Despite what Ms. Stratos had been told, Trish Hogan continued in the Permanent Charge Role for the rest of that schedule (three more weeks) and through the next six-week schedule after that one.  Nine weeks after Ms. Stratos was removed from the role, Ms. Hogan was told the role would be ending.

69.     Ms. Stratos served as Chair of the Precepting Committee working alongside the ICU Educator for about 13 years, from 2006 until July 2019.

70.     During her annual review in June 2019, with Ms. Fitzgerald (then ICU Director), Ms. Stratos mentioned that her role as the Chair of the Preceptor Committee was being diminished to the point where she was not even doing the new orientee schedules.  Ms. Fitzgerald told Ms. Stratos that the Educator was now doing new orientee schedules.

71.     When asked what they expected of Ms. Stratos as the Chair of the Preceptor Committee, Ms. Fitzgerald said she could revise paperwork.  This was a significant demotion from the tasks and responsibilities Ms. Stratos had undertaken previously in this role.  Ms. Stratos told Ms. Fitzgerald that she was disappointed with the change and that she had not been allotted any time to perform that role.

72.     Ms. Stratos' role as Chair of the Preceptor Committee was neither enhanced nor supported by management.  A year later, in June 2020, Ms. Fitzgerald and Ms. Kobrenski sat down at Ms. Stratos' next annual review and they did not offer any support, time, or encouragement to Ms. Stratos.  Ms. Stratos felt like Ms. Fitzgerald and Ms. Kobrenski  wanted her to resign by attrition so the role could be handed to someone else.  Ms. Stratos offered to pick up a new role to fulfill her obligations as a Senior Level Nurse.  Ms. Fitzgerald and Ms. Kobrenski told Ms. Stratos that there were no open committees or roles available at that time.

73.     Ms. Stratos resigned her role as Preceptor Chairperson out of frustration and futility in or about June 2020.

74.     CMC assigned a new Preceptor Chairperson not long after Ms. Stratos' 2020 annual review.  Ms. Stratos was not assigned to precept any new employees after resigning as Chair of the Preceptor Committee.  No one ever spoke to Ms. Stratos to explain why.

75.     Ms. Stratos' days of precepting in CTU (Cardio Thoracic Unit) which was her specialty, dwindled during the fall of 2020.  Ms. Stratos asked the Educator why she was assigned so few days to teach, and the Educator said it was because of the two days off Ms. Stratos needed for school.  Ms. Stratos pointed out that this left three days a week available.  Ms. Stratos also pointed out that she could work around those two days for school if needed.  After this discussion, Ms. Stratos was not assigned any further days to precept in ICU.

76.     For the candidates of the fall 2020 class (three-week orientations for each candidate), Ms. Stratos was not assigned any precepting duties.  Instead, a per diem nurse, the new Chair of the Preceptor Committee, was scheduled precepting duties all five days of the week for three weeks in a row.

77.     No one spoke to Ms. Stratos about this.

78.     This is another example of the "undercurrent," hostile environment, and bias to which Ms. Stratos was subjected at CMC due to her hearing loss.

79.     In March 2020, CMC implemented the Governor's COVID-19 mask mandate for the State of New Hampshire.

80.     Ms. Stratos had already noted in her letter to her coworkers in 2019, that face masks were a challenge for anyone with a hearing impairment, and asked employees to understand this when communicating with her with a mask on.

12

81.     During the first few months of the mask mandate, Ms. Stratos' coworkers were generally more accommodating to her communication needs.  Some coworkers even mentioned how difficult it was for them to hear, even though they did not have a hearing impairment.  They told Ms. Stratos that they now understood how difficult the mask mandate must be for her.

82.     Ms. Stratos' coworkers' empathy only lasted a couple months, and then she was again subjected to the same type of discriminatory hostile work environment she had long been subjected to since suffering from permanent hearing loss.

83.     From March 2020 forward, most of the staff wore double masks most of the time.

84.     On the West Side, which had been designated as the COVID ICU Unit, employees were also required to wear a face-shield on top of their double masks.

85.     In addition, on the West Side, there were very loud HEPA filters running in each room.

86.     This presented an extremely challenging work environment for Ms. Stratos on the West Side, but she was fearful about asking for an accommodation, fearing retaliation and further discrimination.

87.     However, Ms. Stratos did mention to the Charge RN, Dawn McGuire, that perhaps it was not in the best interest of all concerned for her to work on the West Side, given the hearing challenges caused by the mask requirements there.  Ms. McGuire suggested that Ms. Stratos stay on the regular ICU side as usual.

88.     Ms. McGuire subsequently told Ms. Stratos that she would be in charge on the West Side.

89.     In response, Ms. Stratos told Ms. McGuire that staff had been trying to speak through the plastic walls to request things (which was not safe) and that Ms. Stratos could not be

13

expected to hear through the plastic walls. Ms. McGuire agreed afterwards and changed Ms. Stratos' position to West Side "runner."

90. On the days Ms. Stratos was assigned to work on the West Side as the "runner," Ms. Stratos would text her staff at the start of the day reminding them to refrain from talking through the walls and to utilize Voalte system to communicate with her.

91. Ms. Stratos found the use of Voalte, which included texting and bluetooth streamed phone, to be an effective communication tool, and was able to respond promptly and thoroughly to any requests made by staff using that tool.

92. Despite Ms. Stratos' requests, staff continued trying to talk to her through walls and rolled their eyes and threw up their hands whenever she reminded them that she could not hear effectively through the walls.

93. Ms. Stratos did the best she could under these circumstances.

94. CMC management never proactively offered to help Ms. Stratos (except asking staff not to talk through walls).

95. Ms. Stratos' work environment got worse as the mask mandate continued.

96. During the weekend of December 19 and 20, 2020, Ms. Stratos was the RN in charge of the ICU. At one point, Ms. Stratos went over to the West Side to check on staff. No one was answering the walkie-talkie, so Ms. Stratos spoke to a nurse inside the hot zone and the nurse requested a drug from the Pyxis (the machine that dispenses medications) called Labetalol, and a device called a "Rhino rocket" from the ER.

97. The nurse who made this request to Ms. Stratos was a nurse who had long treated her poorly as a result of her permanent hearing loss.

14

98.     Ms. Stratos did not know what the "Rhino rocket" device was, which was being requested by the nurse, but was hesitant about asking the nurse, fearing her likely response.

99.     Ms. Stratos placed the drug in the ante room and went next door to the ICU to find out what the "Rhino rocket" device was.

100.    Ultimately, Ms. Stratos learned what the device was, retrieved it from the ER, brought it to the West Side, and left it for the nurse who had requested it.  Ms. Stratos apologized for the delay and explained she was not familiar with the device, but now would order a box for them to have available in the future.

101.    As Ms. Stratos began to leave the West Side, she received a text on the charge phone and leaned against the wall blocking the nursing station to answer the phone.

102.    When Ms. Stratos did that, she overheard employees talking about her, saying things like: "What good is she?"  "When is she finally going to leave this place?" and "She probably did not hear the request.  How could she not know what it was?"

103.    Ms. Stratos heard only one coworker defend her, saying that Ms. Stratos had heard the request, didn't know what the "Rhino rocket" was, left to find out, obtained the device, and dropped it back off on the West Side just like any other nurse would have done in that situation.

104.    Ms. Stratos then left the West Side.  This incident was so upsetting to her that she sobbed for days.

105.    On another occasion, in late December 2020, Ms. Stratos was randomly assigned as a Preceptor for a day (she had not precepted since June 2019) by the Educator.  Nurses coming in for change of shift could hear this conversation with the Educator making a decision as to what side and what room to assign Ms. Stratos for the next day to precept.

15

106.   Later, Ms. Stratos went to the South Side and when she turned the corner and was blocked by a pillar, she overheard a nurse say, "You would not believe who they are having precept a new graduate tomorrow – Katherine.  It's like the deaf leading the blind."

107.   After hearing that, Ms. Stratos walked across the room, so she believed it was clear to her coworkers that her had heard what had been said.  They got quiet.  As Ms. Stratos walked through the doors leaving the South Side, she heard her coworkers burst out laughing.

108.   Ms. Stratos reported this incident to Diane Kobrenski, then the current ICU Director, by phone later that evening from home.  Ms. Stratos initially said it might not be the best decision to have her precept on the West Side due to the extenuating conditions due to COVID precautions and offered names of other nurses who could fill that role.  Ms. Kobrenski said Ms. Stratos was the best Preceptor.  So, Ms. Stratos further explained the incident she witnessed (above) as a further reason to not precept.  Ms. Kobrenski asked Ms. Stratos for the names of the coworkers who had been involved with this incident, but Ms. Stratos was reluctant to provide the names, fearing further discrimination and retaliation.

109.   Ms. Kobrenski decided that Ms. Stratos would work as the Preceptor the next day with the new graduate on the West Side.

110.   The next day, Ms. Stratos told the orientee about her hearing impairment and instructed her how to communicate with her.  Ms. Stratos told her that if she felt frustrated or concerned to let her know, and that they would find other accommodation for her.

111.   However, Ms. Stratos was frustrated, anxious, and humiliated when she saw coworkers on the inside rolling their eyes, talking to each other after an encounter with her, and making it clear how much they did not like working with her as a result of her permanent hearing loss.

16

112.     On December 29, 2020, Ms. Stratos cried again when she left work having reached a point of feeling sad, anxious, defeated, humiliated, embarrassed, angry, worthless and, most of all, thoroughly exhausted emotionally.

113.     As a result, Ms. Stratos wrote to CMC on January 2021, again requesting reasonable accommodations from CMC.  In her letter, Ms. Stratos told CMC that she would be happy to discuss what reasonable accommodations would be appropriate to allow her to continue to do her job.

114.     As one potential reasonable accommodation, Ms. Stratos requested that she not be placed on the West Side COVID ICU with a patient assignment for the reasons described above.

115.     As another potential reasonable accommodation, Ms. Stratos requested to be assigned on the West Side to be the "Runner" role.  This role utilized technology with the Voalte phone.  All requests from the coworkers inside the hot zone were texted to the Runner detailing what they needed such as meds, supplies, etc.  The Runner then has his/her requests right there in digital text and he/she can perform the tasks necessary to fulfill their needs.

116.     As another potential reasonable accommodation, Ms. Stratos requested to have a one-patient acute assignment in the general ICU.  This would have allowed her to concentrate in one room, to keep the doors shut to filter out extraneous noise, and to focus on communicating with the providers and coworkers involved in that one patient's case.

117.     There is nearly always an acute one-patient assignment in ICU.

118.     Ms. Stratos told CMC at that time, that she continued to be treated for her hearing loss by Dr. James Snyder, ENT Londonderry, NH, and Dr. Dennis Poe of Mass Eye and Ear Institute.  Ms. Stratos also told CMC that she continued to be followed by her Audiologist, Al

17

Langley, at the Hearing Enhancement Center in Bedford, NH.  (Mr. Langley provides audiology testing, hearing devices, fine tunes them, and shows her how to utilize the technology).

119.    Ms. Stratos told CMC that her goal was to sit down with Mr. Langley and go over any new technology that had been developed, and fine-tune her current devices to maximize their performance.

120.    Ms. Stratos told CMC that Mr. Langley also dealt with other nurses who are hearing impaired and might have suggestions to offer what others had successfully utilized, especially during the COVID mask mandate.

121.    In her letter to CMC, Ms. Stratos emphasized that she had been a hardworking, dedicated Registered Nurse in the ICU at CMC for 22 years, that she wanted to continue her employment at CMC, but could only do so if CMC would provide reasonable accommodations and would see to it that the discrimination, negative bias, and hostile work environment due to her hearing impairment, ceased.

122.    Ms. Stratos told CMC that she would be happy to meet to provide CMC with further examples of treatment to which she had been subjected by coworkers due to her hearing impairment.

123.    Ms. Stratos also indicated that once the mask mandate ended, she believed that the significant hearing barrier caused by the masks would be removed.

124.    After Ms. Stratos sent the January 2021 letter to CMC asking for reasonable accommodation, Ms. Kobrenski met with her.  In that meeting, Ms. Stratos reiterated to Ms. Kobrenski the potential reasonable accommodations that she believed would allow her to continue to perform the essential functions of her position as RN.

125.    Following their discussion, Ms. Kobrenski decided that the most appropriate accommodation for Ms. Stratos would be to have a one-patient acute assignment.

126.    Ms. Kobrenski asked if Ms. Stratos would temporarily work the night shift (a shift to which she had never been assigned), because they were short-staffed on nights.  She said she felt that this was a safer shift for Ms. Stratos to work on.  Ms. Stratos was confused by her response and asked if she had received any safety complaints by staff and/or providers, and Ms. Kobrenski said she had not.  Ms. Stratos agreed to work on the night shift temporarily to help out.

127.    Ms. Kobrenski then sent an email to all charge nurses stating that, as an accommodation to Ms. Stratos, she was to be assigned a one-patient, acute assignment only.

128.    Ms. Stratos worked a six-week shift on nights (since she had agreed to help by working nights on a short-term basis).

129.    Ms. Stratos was asked to do a second six-week schedule on night shift by Ms. Kobrenski. They had been short-staffed on nights.  Ms. Stratos knew Ms. Kobrenski felt it was a safer shift overall.  Ms. Stratos did not want to seem resistant and give them any cause to fault her with repercussions, so, Ms. Stratos agreed to Ms. Kobrenski's request.

130.    This made Ms. Stratos feel like CMC was likely hiding her away in a place where she would have the least contact with patients and coworkers because of her disability.

131.    In or about April of 2021, Ms. Stratos had a discussion with a new RN who was approximately three months into her orientation period.

132.    The new RN was walking back and forth down a hallway, and it was clear that she was looking for help.  Ms. Stratos asked her if she could help her with anything.  She responded that there was no one else around, and so she would have to ask for Ms. Stratos' help.

19

133.    Ms. Stratos proceeded to spend about one-half hour helping the new RN with questions, guidance, and hands-on care.  After Ms. Stratos finished helping her, she asked the new RN what she meant when she said that there was no one else around to help so she had no choice but to ask for Ms. Stratos' help.

134.    The new RN nurse said that one of her Preceptors, who had pointed Ms. Stratos out to her on several occasions, told her not to bother asking Ms. Stratos for help.  She said that when she asked, "why not," she had been told that Ms. Stratos was not likely to hear her, and that there were other people around who would be better to ask for help.  She then said that she had learned more from Ms. Stratos in one-half hour than from any Preceptor on any given day of her orientation.  Ms. Stratos told her she would be happy to help her any time.

135.    In May 2021, Ms. Stratos asked Ms. Kobrenski, now ICU Director, if they could meet.  Ms. Stratos asked her about promotional opportunities for her at CMC, noting that she had been an employee for nearly 23 years.

136.    Ms. Kobrenski told Ms. Stratos that she could not think of any opportunities that were available for Ms. Stratos, but said she would speak with Ms. Fitzgerald, now Critical Care Director, and then let her know.

137.    During that conversation, Ms. Stratos asked Ms. Kobrenski why she was not precepting in the CTU (Cardio Thoracic Unit/Open Hearts), and Ms. Kobrensi said that sometimes nurses learn better from Preceptors with different approaches.

138.    Ms. Stratos asked Ms. Kobrenski if any orientee had asked not to have her as a Preceptor, and Ms. Kobrenski did not respond either affirmatively or negatively.

139.    Ms. Kobrenski asked Ms. Stratos about her long-term goals.  Ms. Stratos told her that there seemed to be no hope for her at CMC, and that Ms. Stratos had sought promotional

opportunities for years, but had not been promoted.  Ms. Stratos mentioned finishing the Legal Nurse Consultant Program she had started the previous August 2020.

140.    Ms. Kobrenski nodded in agreement.  She told Ms. Stratos that she was one of the most senior nurses and had vast experience and a high level of knowledge, and that she appreciated what Ms. Stratos was capable of doing.  Ms. Stratos told her that she thought that Ms. Fitzgerald was negatively influencing Ms. Kobrenski' ability to promote and support Ms. Stratos.  Ms. Kobrenski has always been kind, aware of Ms. Stratos' abilities, and as supportive as she could be, given the management she answered to.  Ms. Kobrenski did not specifically respond affirmatively or negatively.

141.    As a result of CMC's discriminatory and retaliatory treatment of Ms. Stratos, she was constructively terminated from her job at CMC.

142.    Ms. Stratos accepted a position at another hospital on or about May 7, 2021, to start in July 2021.

143.    Ms. Stratos gave Ms. Kobrenski her letter of resignation on May 28, 2021.  Ms. Kobrenski appeared to be shocked and upset with Ms. Stratos' resignation and said she had hoped it would not come to this.

144.    Ms. Stratos told her that she could not continue working in a hostile work environment due to her hearing impairment and without any opportunity to evolve in her career in the ICU at CMC to which she had given 23 years.

145.    Again, Ms. Stratos asked Ms. Kobrenski if there were any promotional opportunities available to her at that time in the ICU at CMC, and Ms. Kobrenski stated that there were not any listed job openings for Ms. Stratos of which she was aware.

146.    Ms. Stratos told her that she had been subjected to a discriminatory, punitive, and retaliatory management (specifically by Ms. Lambert and Ms. Fitzgerald, but not Ms. Kobrenski), and a hostile work environment at CMC.  Ms. Stratos told Ms. Kobrenski that Ms. Kobrenski was already aware of the things that previous and current management had said and were currently saying about Ms. Stratos behind her back about her hearing impairment, because Ms. Kobrenski had been in a management position in CMC's ICU since 1998.

147.    Ms. Stratos told Ms. Kobrenski that no other nurse would have received the written warnings in 2018 and 2019, that Ms. Stratos had received.  The reasons stated for the warnings were not accurate, were taken out of context, and a negative, personal, bias was applied to the judgement without an equal representation of all sides during the supposed "investigation." Ms. Kobrenski agreed that it was very unlikely another nurse would have faced what Ms. Stratos had been called out for.

148.    Ms. Stratos told Ms. Kobrenski that the treatment toward her had caused her heartache, anxiety, fear, despair, loss of self-esteem, and no hope for the future.  Ms. Kobrenski said she understood why Ms. Stratos had no choice but to leave her employment with CMC.  She indicated that she would notify Ms. Fitzgerald and Human Resources.

149.    On her last day of work at CMC, June 17, 2021, Ms. Stratos had a discussion with her coworker Lynn Harkins, who had just learned that Ms. Stratos was leaving CMC.  Ms. Harkins asked her whether management had offered her a new job description in order to stay at CMC.  Ms. Stratos told her that she had been told there were no promotional opportunities available for her.

150.    Ms. Harkins indicated that CMC had just hired two far less experienced nurses for the positions of "Hospital Wide Resource Educator."  Ms. Stratos had not been made aware of these proposed positions.

151.    Ms. Harkins indicated that the positions of Hospital Wide Resource Educator had been in the works for the last few months and asked why Ms. Kobrenski had not mentioned this promotional opportunity to Ms. Stratos.  Ms. Stratos told her that she did not know the reason, but it was definitely not mentioned to her at any time.  Ms. Harkins stated Ms. Stratos would have been the perfect candidate for this position. Ms. Harkins approached Ms. Kobrenski about this and was given the name of someone in the Education Department for Ms. Stratos to contact. It was Ms. Stratos' last day and it was not viable for her to pursue a new position at CMC at that stage.  It was clear that CMC did not want to consider Ms. Stratos for the position.

152.    Ms. Stratos believes Ms. Kobrenski experienced undue negative influence by her superiors which made it difficult for her to override their suggestions and decisions against Ms. Stratos, despite her multiple attempts to speak on Ms. Stratos' behalf.  This incident took place after Ms. Stratos had filed the complaint to Human Resources in January of 2021.

153.    Ms. Stratos was fully qualified for the position of Hospital Wide Resource Educator, and she believes that but for discrimination, bias, and retaliation against her based upon her permanent hearing impairment and based upon her complaint filed to CMC in January 2021, requesting accommodation for her permanent hearing loss, that Ms. Stratos would have been informed and encouraged to apply for one of the Hospital Wide Resource Educator positions.

154.     Since the constructive termination of Ms. Stratos' employment with CMC, she has suffered lost wages and benefits, and will continue to suffer lost wages and benefits into the future.

155.     In addition, the termination of Ms. Stratos' employment by CMC has caused, and continues to cause, her emotional harm.

156.     In addition, she has incurred, and will incur, attorneys' fees and costs.

157.     Ms. Stratos believes that CMC discriminated against her on the basis of her disability, subjected her to a hostile work environment based on her disability, and retaliated against her for reporting discrimination and for requesting reasonable accommodation.

158.     Ms. Stratos seeks all recoverable damages available pursuant to the ADA/ADAAA and RSA 354-A.

## COUNT I
## Violation of ADA and ADAAA
## Discrimination

159.     The Plaintiff hereby incorporates by reference the preceding paragraphs and makes them a part of this Count as though fully set forth herein.

160.     The Defendant discriminated against and constructively discharged Ms. Stratos' employment because of her disability (actual, record of, and/or regarded as).

161.     In failing to promote, and constructively discharging Ms. Stratos and in otherwise violating the ADA and ADAAA, the Defendant acted with malice and/or with reckless indifference to Ms. Stratos' federally-protected rights.

162.     As a direct and proximate result of the Defendant's unlawful and discriminatory actions, Ms. Stratos has suffered damages, including lost back pay and benefits, front pay and future lost benefits, compensatory damages for future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses, punitive damages, pre-judgment and post-judgment interest, and attorneys' fees and costs.

## COUNT II
## RSA 354-A – Disability Discrimination

163.    The Plaintiff hereby incorporates by reference the preceding paragraphs and makes them a part of this Count as though fully set forth herein.

164.    As further detailed in Count I, the Defendant discriminated against Ms. Stratos on the basis of her disability in violation of N.H. RSA 354-A:7, culminating in the constructive discharge of her employment.

165.    Ms. Stratos brings this action pursuant to N.H. RSA 354-A:21-a.

166.    In failing to promote, and constructively discharging Ms. Stratos and in otherwise violating RSA 354-A, the Defendant acted with willful and/or with reckless disregard of Ms. Stratos' legally-protected rights.

167.    Ms. Stratos has suffered damages, including, but not limited to, lost wages and benefits, future lost wages and benefits, pre-judgment and post-judgment interest, attorneys' fees and costs, and emotional distress.

168.    Ms. Stratos seeks to recover her lost wages and benefits, future lost wages and benefits, compensatory damages, enhanced compensatory damages, pre-judgment and post-judgment interest, and attorneys' fees and costs, pursuant to RSA 354-A:21, II (d).

## COUNT III
## Disability-Based Hostile Environment – ADA and ADAAA

169.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

170.     As more particularly described in Count I above, in failing to promote and constructively discharging Ms. Stratos and in otherwise violating the ADA and ADAAA, the Defendant acted with malice and/or with reckless indifference to Ms. Stratos' federally- protected rights by subjecting Plaintiff to disability-based harassment (hostile environment) during her employment with the Defendants, as described in this Complaint.

171.     The repeated offensive comments and conduct were based on Plaintiff's disability.

172.     The repeated offensive comments and conduct regarding Plaintiff's disability were so severe and/or pervasive that they created an offensive and demeaning work environment for Plaintiff and interfered with her ability to perform her job.

173.     The Defendant had actual knowledge of the disability-based harassment because Plaintiff reported the disability discrimination to the Defendant, as described in this Complaint.

174.     Despite reporting the disability-based harassment to the Defendant, the Defendant failed to take appropriate remedial action that would have enabled Plaintiff to continue working without the threat of being subjected to a hostile and inappropriate work environment.

175.     Plaintiff did not welcome, encourage, or consent to the disability-based harassment to which she was subjected as an employee of the Defendant.

176.     The disability-based harassment to which Plaintiff was subjected as an employee of the Defendant has had, and continues to have, a detrimental effect upon her employment and personal well-being.

177.     The Defendant's unlawful employment practices in allowing Plaintiff to be subjected to disability-based harassment and in failing to take prompt remedial action to see to it that the disability-based harassment ended, violated the ADA and ADAAA.

178.     As a direct and proximate result of the Defendant's violation of the Plaintiff's rights secured under the ADA and ADAAA as stated herein, the Plaintiff has incurred damages including lost back pay and benefits, front pay and future lost benefits, compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses, punitive damages, pre-judgment and post-judgment interest, and attorneys' fees and costs.

## COUNT IV
## Disability-Based Hostile Environment – RSA 354-A

179.     Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

180.     As more particularly described above, in failing to promote and constructively discharging Ms. Stratos and in otherwise violating New Hampshire RSA 354-A, the Defendant acted with malice and/or with reckless indifference to Ms. Stratos' protected rights by subjecting Plaintiff to disability-based harassment (hostile environment) during her employment with the Defendants as described in this Complaint.

181.     As a direct and proximate result of the violation of the Plaintiff's rights secured under RSA 354-A, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, enhanced compensatory damages, and attorneys' fees and costs.

## COUNT V
## RETALIATION –ADA and ADAA

182.     Ms. Stratos re-alleges and incorporates herein by reference, all of the allegations contained in the preceding paragraphs.

183.     After Ms. Stratos notified Defendant of her hearing loss, her need for an accommodation, and offensive disability-based comments and conduct in the workplace, Defendant retaliated against Ms. Stratos as described throughout the Complaint, culminating in the failure to promote and the constructive discharge of her employment.

184.     As a result of Defendant's actions as described herein, the Defendant willfully violated the ADA/ADAA.

185.     As a direct and proximate result of the Defendant's violation of the Plaintiff's rights secured under the ADA and ADAAA, as stated herein, the Plaintiff has incurred damages including lost back pay and benefits, front pay and future lost benefits, compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses, punitive damages, pre-judgment and post-judgment interest, and attorneys' fees and costs.

**COUNT VI**
**RETALIATION – RSA 354-A**

186.     Ms. Stratos re-alleges and incorporates herein by reference, all of the allegations contained in the preceding paragraphs.

187.     After Ms. Stratos notified Defendant of her hearing loss, her need for an accommodation, and offensive disability-based comments and conduct in the workplace, Defendant retaliated against Ms. Stratos as described throughout the Complaint, culminating in the failure to promote and the constructive discharge of her employment.

188.     As a result of Defendant's actions as described herein, the Defendant willfully violated RSA 354-A.

189.     As a direct and proximate result of the violation of the Plaintiff's rights secured under RSA 354-A by the Defendant, as stated herein, the Plaintiff has incurred damages in the form of back pay and benefits, front pay and benefits, and lost future earnings and benefits, compensatory damages, enhanced compensatory damages, and attorneys' fees and costs.

Respectfully submitted,

KATHERINE H. STRATOS, Plaintiff

By Her Attorneys
UPTON & HATFIELD, LLP

Date:  June 7, 2022                              By: _____
Heather M. Burns (NHBA #8799)
Lauren S. Irwin, (NHBA #10544)
Brooke Lovett Shilo (NHBA #20794)
10 Centre Street, PO Box 1090
Concord, NH  03302-1090
(603) 224-7791
hburns@uptonhatfield.com

# EXHIBIT A

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website:  www.eeoc.gov

## <u>DISMISSAL AND NOTICE OF RIGHTS</u>
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 05/13/2022

**To:** Katherine Stratos
3 Joan Street
Derry, NH 03038

Charge No: 16D-2021-00222

EEOC Representative and email:    Amon Kinsey
Supervisory Investigator
amon.kinsey@eeoc.gov

---

## DISMISSAL OF CHARGE

The EEOC is closing this charge because: Charging Party is pursuing claims in another forum.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Judy Keenan
05/13/2022

Judy Keenan
District Director

**Cc:**
Nancy Oliver
JACKSON LEWIS
nancy.oliver@jacksonlewis.com

Heather Burns
UPTON & HATFIELD
hburns@uptonhatfield.com

Please retain this notice for your records.